IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MARY J., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:25CV793 |
| | ) | |
| FRANK BISIGNANO, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Mary J. ("Plaintiff") brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed applications for DIB and SSI on June 7, 2022, alleging a disability onset date of May 1, 2022 in both applications. (Tr. at 17, 262-75.)[1] Her applications were denied initially (Tr. at 96-121, 150-55) and upon reconsideration (Tr. at 122-47, 181-88). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative

[1] Transcript citations refer to the Sealed Administrative Record [Doc. #5].

Law Judge ("ALJ"). (Tr. at 189.) On January 15, 2025, Plaintiff, along with her attorney, attended the subsequent telephone hearing, at which Plaintiff and an impartial vocational expert testified. (Tr. at 17, 45-95.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 35), and on July 3, 2025, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

## II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

## III. DISCUSSION

In the present case, the ALJ determined that Plaintiff had not engaged in "substantial gainful activity" since May 1, 2022, her alleged onset date. Accordingly, the ALJ concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 20.) At step two, the ALJ found that Plaintiff suffered from the following severe impairments:

> osteoarthritis; degenerative disc disease; residuals from gastric bypass; migraines; bipolar disorder; major depressive disorder; anxiety; borderline personality disorder; posttraumatic stress disorder (PTSD); and substance use disorder[.]

(Tr. at 20.) The ALJ determined at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 21-24.) Therefore, the ALJ assessed Plaintiff's RFC and concluded that she could perform medium exertional level work, but with the following, non-exertional limitations:

> [Plaintiff] can lift, carry, push, and/or pull fifty pounds occasionally and twenty-five pounds frequently. She can sit for up to six hours in an eight-hour workday and can stand and/or walk for up to six hours in an eight-hour workday. She can frequently climb, stoop, crouch, and crawl. She is limited to understanding, remembering, and carry out simple instructions, using judgment to make simple work-related decisions, and when so limited, can sustain concentration, attention, and pace for two-hour intervals over the course of an eight-hour

> workday. She is limited to frequent contact with coworkers but can only occasionally perform tasks requiring teamwork. She is limited to frequent contact with supervisors and occasional interaction with the public. She is limited to work in a low-stress setting, which is defined to mean work involving: no paced production requirements, such as on an assembly line where the worker does not control the pace of production; only occasional changes in the work setting or routine; and no dealing with crisis situations as an essential function of the job.

(Tr. at 24.) At step four of the analysis, the ALJ determined, based on the testimony of the vocational expert, that Plaintiff's past relevant work as a hospital cleaner did not "require the performance of work-related activities precluded" by her RFC. (Tr. at 33.) In addition to finding Plaintiff capable of returning to her past relevant work, the ALJ found at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the vocational expert regarding those factors, Plaintiff could perform other jobs available in the national economy. (Tr. at 34-35.) The ALJ concluded, based on her findings at steps four and five, that Plaintiff had not been under a disability, as defined by the Act, between her May 2, 2022 alleged onset date and the date of the administrative decision, April 14, 2025.

Plaintiff now argues that, when formulating her RFC, the ALJ "cherrypicked" the evidence, citing normal findings while ignoring or summarily discounting medical and opinion evidence supportive of greater restrictions. See Lewis v. Berryhill, 858 F.3d 858, 869 (4th Cir. 2017) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." (internal quotation omitted)); Arakas v. Comm'r of Soc. Sec., 983 F.3d 83, 98 (4th Cir. 2020) (finding that the ALJ's decision was "unsupported by substantial evidence" where "the ALJ erred by [] selectively citing evidence from the record"). As part of this challenge, Plaintiff argues that the ALJ minimized evidence of Plaintiff's homelessness

and psychiatric hospitalizations as well as the medical opinion of the consultative examiner, Andrea Sinclair, Psy.D., while instead focusing on "unremarkable" mental status examination findings. In doing so, Plaintiff contends that "the ALJ provided an internally inconsistent decision that . . . depicts [Plaintiff] as severely mentally ill, while simultaneously making inherently contradictory findings that her mental illness was accurately rated as 'moderate.'" (Pl.'s Br. [Doc. #8] at 3) (citing Tr. at 22-23).

Plaintiff's challenge primarily hinges on the ALJ's analysis of Plaintiff's mental health symptoms. Under the applicable regulations, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017) ("SSR 16-3p"); see also 20 C.F.R. § 404.1529. Moreover, in Arakas, the Fourth Circuit clarified the procedure an ALJ must follow when assessing a claimant's statements:

> When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.
>
> Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016 WL 1119029, at *4–5. SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic

> techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

983 F.3d at 95–96; see also Hines, 453 F.3d at 564-65; Shelley C. v. Comm'r of Soc. Sec. Admin., 61 F.4th 341, 361–62 (4th Cir. 2023) ("The Fourth Circuit has long held that while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity. Indeed, because pain is not readily susceptible of objective proof . . . , the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative." (internal citations and quotations omitted)).

In the present case, Plaintiff contends that the ALJ improperly relied on instances of "unremarkable" mental status examinations in the record, while simultaneously minimizing evidence supportive of greater limitations. In terms of Plaintiff's inpatient psychiatric treatment, the ALJ acknowledged that Plaintiff was involuntarily psychiatrically hospitalized due to suicidal ideation in September 2022, after which she was discharged to Hope Recovery Center for six months of rehabilitative treatment. (Tr. at 20, 29, 30.) The ALJ also noted that Plaintiff was hospitalized for a bipolar episode in April 2024. (Tr. at 30.) Plaintiff contends that the ALJ failed to adequately reconcile this evidence of mental instability with her ultimate findings that Plaintiff remained able to work. (Pl.'s Br. at 4.) Plaintiff notes that she was admitted for psychiatric hospitalization in February 2022, based on a suicide attempt, a few weeks before the alleged onset date. (Tr.at 654-55, 807, 812). In May 2022, she continued to report suicidal ideation. (Tr. at 853, 898.) After the alleged onset date in May 2022, she spent five months homeless, living in the woods behind a dog groomer and sleeping in other

people's cars, and was dirty and malodorous at her medical appointments. (Tr. at 921-922, 922-24, 973.) She was involuntarily admitted for psychiatric hospitalization for over a week in September 2022, after having been assessed as suffering from a mental health impairment that rendered her a danger to herself or others (Tr. at 1149-50, 1038.) She was then transferred to an inpatient treatment program for several months until early 2023. (Tr. at 1162-72, 1223.) In January 2023, she underwent a consultative psychiatric evaluation, and the examiner concluded that she would "have difficulty staying on task or remembering job duties," that "it does not appear that [Plaintiff] could tolerate extended work related stresses and demand, or just the work environment schedule," and that with respect to getting along with coworkers and supervisors she "is likely to have some difficulty due to her paranoia of others, as well as beliefs that others are always staring at her." (Tr.at 1217.) The consultative examiner recommended that she have a payee if awarded benefits, based on concerns regarding her ability to manage funds herself. (Tr. at 1217.) In April 2023, treatment notes reflect ongoing "Excessive stress, Mood changes, Behavioral change, Psychiatric disorders, Anxiety, Depression." (Tr. at 1254.) Thereafter, Plaintiff was again hospitalized on an involuntary psychiatric admission for over a week in April 2024, in which Plaintiff was in a psychotic state, hallucinating, and unable to identify reality. (Tr. at 1368, 1372.)

Defendant counters that "the ALJ did not sugarcoat this evidence." (Def.'s Br. [Doc. #9] at 9.) Instead, the ALJ "considered that Plaintiff was hospitalized in February 2022, a time Plaintiff admitted to regularly smoking methamphetamine, in September 2022, when Plaintiff also admitted to using methamphetamine and going through withdrawal, and in April 2024, when substance abuse exacerbated Plaintiff's bipolar disorder." (Def.'s Br. at 9) (citing Tr. at

20, 25, 29-30, 654, 547, 1065, 1151, 1154, 1368). Defendant also notes that the ALJ relied on Plaintiff's normal mental exams, specifically that Plaintiff "generally had normal mental status exam findings, apart from visits when she admitted or was found to be using illicit drugs." (Def.'s Br. at 6.) In short, Defendant argues, the ALJ discounted Plaintiff's mental health symptoms to the extent Plaintiff used illicit substances during the time period surrounding these events. The Court agrees that the ALJ did just that. However, the ALJ did not then undertake the required analysis under the Act for evaluating cases involving drug use.

A claimant cannot be considered disabled for Social Security purposes if alcoholism and/or drug use is "a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). To determine whether this is the case, the regulations provide as follows:

> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
>
> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
>
>> (i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>>
>> (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. § 404.1535(b). In other words, § 404.1535 describes a two-step process, which has been further codified and clarified in Social Security Ruling 13-2p. Social Security Ruling 13-

2p, Titles II And XVI: Evaluating Cases Involving Drug Addiction And Alcoholism (DAA), SSR 13-2p, 2013 WL 621536 (Feb. 20, 2013) ("SSR 13-2p"). As part of that two-step process, an ALJ "must *first* make a determination as to disability by following the five-step sequential evaluation process, 'without segregating out any effects that might be due to substance use disorders.'" Piccini v. Comm'r of Soc. Sec., No. 13-CV-3461 AJN SN, 2014 WL 4651911, at *12 (S.D.N.Y. Sept. 17, 2014) (quoting Brueggemann v. Barnhart, 348 F.3d 689, 694 (8th Cir. 2003)). If the ALJ finds the claimant disabled based on symptomology alone, he must then follow the five-step sequential analysis a second time to determine "whether the claimant would still be considered disabled if [she] stopped abusing drugs or alcohol." See Piccini, 2014 WL 4651911, at *12.

In this case, the ALJ never explicitly considered the materiality of Plaintiff's substance abuse disorders as prescribed by 20 C.F.R. § 404.1535(b) and SSR 13-2p. The ALJ clearly included substance use disorder among Plaintiff's severe impairments at step two of the sequential analysis, and additionally found as follows regarding Plaintiff's substance use:

> In February 2022, the claimant reported intentionally overdosing with Tylenol, and at that time, she tested positive for amphetamines. In May 2022, the claimant reported seeing a counselor related to methamphetamine abuse. In September 2022, the claimant was involuntarily psychiatrically hospitalized due to suicidal ideation; she admitted to methamphetamine withdrawal symptoms, including shaking, having anxiety, craving more drugs, and having body aches. She reported wanting to detox herself at home. In April 2024, the claimant was admitted to the inpatient psychiatric unit at David Regional Medical Center in connection with an episode of psychosis, which was initially believed to be methamphetamine-induced although she admitted to using only CBD. She reported calling the police to report a home intruder, and it was found that there was no one there. At a psychiatric evaluation during this hospitalization, she was found to have several abrasions on her face that appeared consistent with scabs from picking due to crystal methamphetamine use. In the same month, she was seen in the emergency department, reporting shortness of breath that began after using methamphetamine that day. After considering the entire

record, the undersigned finds that the objective medical evidence is sufficient to establish substance use disorder as a medically determinable impairment, as well as a maladaptive pattern of substance use that has led to clinically significant impairment or distress.

(Tr. at 20) (internal citations omitted).[4] Despite this finding, the ALJ went on to repeatedly cite Plaintiff's use of methamphetamine and other substances when discounting the overall impact of her bipolar disorder, major depressive disorder, anxiety, borderline personality disorder, and PTSD, and "it is not clear from the ALJ's decision that he actually went through the full five-step sequential evaluation first with an eye 'strictly [on the] symptoms, not [the] causes,'" as required by the regulations. Morales v. Colvin, No. 13 CIV. 06844 LGS DF, 2015 WL 2137776, at *25 (S.D.N.Y. May 4, 2015) (quoting Newsome v. Astrue, 817 F. Supp. 2d 111, 134 (E.D.N.Y. 2011)). For example, in finding only moderate limitations in Plaintiff's ability to adapt and manage herself, the ALJ noted that "according to [Plaintiff], in a typical

---

4 . . . [B]efore evaluating whether polysubstance abuse is a contributing fact to a finding of disability, the ALJ must first conduct the regular five-step disability inquiry to determine if a claimant is disabled, including as part of this inquiry the impact of any alcoholism or drug addiction. It is only after that point, if the ALJ finds that the claimant is disabled and there is "medical evidence of [his or her] drug addiction or alcoholism," that the ALJ then proceeds under § 404.1535 to determine whether the claimant "would still [be found] disabled if [he or she] stopped using alcohol or drugs." 20 C.F.R §§ 404.1535, 416.935; see Bustamante v. Massanari, 262 F.3d 949, 955 (9th Cir. 2001); Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001); Fennell v. Astrue, No. 4:09–3051–JFA–TER, 2011 WL 1049094, at *4 (D.S.C, Mar. 21, 2001); Puffenbarger v. Commissioner, No. 1:09CV77, 2010 WL 3521583, at *3 (N.D.W. Va. Sept. 7, 2010). Stated another way, if the ALJ finds that a Plaintiff's condition is disabling, he is then required to determine whether the Plaintiff's substance abuse was a contributing factor material to the determination of disability, as disability due to drug addiction and alcoholism is not a proper basis for an award of benefits under the Social Security Act if the addiction is a contributing factor material to the determination of disability. 42 U.S.C. §§ 423(d)(2)(c), 1382c (a)(3)(J); see also 20 C.F.R. § 416.935. See also Farkas v. Astrue, No. 11–242, 2012 WL 750547, at * 2 (M.D. Fla. Mar. 8, 2012) ("The Regulations make clear that a finding of disability is a *condition precedent* to the application of [the law requiring a determination of whether alcohol or drug addiction is a contributing factor material to the determination of disability]"] (emphasis added).

Hundley v. Colvin, Civil Action No. 9:14-4115-BHH-BM, 2016 WL 423548, at *5 (D.S.C. Jan. 12, 2016), report and recommendation adopted, Civil Action No. CV 9:14-4115-BHH, 2016 WL 404075 (D.S.C. Feb. 3, 2016).

day, she lays in the fetal position or sits on the floor rocking back and forth . . . [b]ut treatment notes generally show [Plaintiff] has normal mental status exam findings apart from visits in which she admitted – or was found to be using – illicit drugs." (Tr. at 23.) Similarly, the ALJ noted throughout the decision that without the use of illicit substances, Plaintiff's condition significantly improved. (See Tr. at 20, 23, 28, 29, 30.) Nevertheless, it does not appear that the ALJ sufficiently conducted two separate analyses as required, or in any way parsed the extent to which Plaintiff's mental health symptoms were based on substance abuse rather than her other, myriad, severe mental impairments.

In discussing Plaintiff's hearing testimony in the context of her RFC assessment, the ALJ recounted Plaintiff's testimony regarding her mental health as follows:

> [Plaintiff testified that s]he experiences periods of depression and periods of mania. She stopped working due to a mental breakdown. She has about twenty days in a thirty day [period] in which she wants to stay in her room due to mental health symptoms. . . . She testified she tested positive for methamphetamine in the hospital and believed her then-husband gave it to her, possibly in her drink. She further testified she [had] not use[d] illegal or recreational drugs, including marijuana or prescription medications not prescribed to her, since May 1, 2022. She was hospitalized in September 2022 and then proceeded to Hope Recovery for six months. She also received treatment for methamphetamine use and used two weeks before the hospitalization. Contrary to her earlier testimony, she acknowledged using crack cocaine in late 2023 to early 2024. . . . She has few friends and rarely goes out.

(Tr. at 25.) Later in the RFC analysis, the ALJ found that Plaintiff

> has a history significant for mental health issues, including substance abuse, and treatment notes indicate some of her anxiety and psychoses episodes were triggered by illicit drug use and withdrawal. In February 2022, [Plaintiff] was hospitalized for an attempted suicide with acetaminophen, and at that time, admitted to smoking methamphetamine regularly. . . . [She] was discharged the following day and recommended to resume usual activities as tolerated. In May 2022, [Plaintiff] followed up with Dr. Minton and reported feeling depressed and having difficulty coping. She reported seeing a counselor for depression and drug use. She described having suicidal ideation with no plan, hopelessness,

> and fatigue. She was found to be doing well on current medication for depression.

(Tr. at 28-29) (internal citations omitted). Dr. Minton's treatment notes from the next month, June 2022, "indicate[d that Plaintiff's] symptoms [had] worsened and she was pursuing admittance to a women's shelter program for substance abuse." (Tr. at 29, 870.) She was thereafter involuntarily hospitalized in September 2022, and "admitted to methamphetamine use as well as withdrawal symptoms." (Tr. at 29, 1149-50.) In January 2023, Dr. Minton "assessed [Plaintiff] as having stimulant abuse with stimulant-induced anxiety disorder." (Tr. at 29.) Nevertheless, Plaintiff reported to both Dr. Minton and Dr. Sinclair, who performed the psychological consultative examination the same month, that Prozac was helpful in lessening her anxiety and depression symptoms. (Tr. at 29.) In February 2024 she was also prescribed buspirone for breakthrough anxiety (Tr. at 30). Nevertheless, as previously noted, Plaintiff was again hospitalized in April 2024, this time due to "a bipolar disorder episode, which was exacerbated by substance abuse." (Tr. at 30.)

The ALJ's use of the phrase "exacerbated by substance abuse" is notable, because without the two-phase analysis required by the regulations, it remains impossible for the Court to discern the extent to which the ALJ found that Plaintiff's other underlying, severe mental impairments were at the root of her symptomology, and to what extent the "exacerbating" substances were to blame. Accordingly, it is "not entirely clear that the ALJ would have . . . reached the same conclusion had [s]he adhered to the regulations." Morales, 2015 WL 2137776, at *27.

"The Court is mindful that, when the proper legal analysis is followed, the ALJ may conclude that substantial evidence supports a finding of no disability. But to assume that

conclusion 'creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles.'" Piccini, 2014 WL 4651911, at *16 (quoting Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998)). Accordingly, upon remand, "[t]he ALJ must base his initial disability determination on substantial evidence of [Plaintiff's] medical limitations without deductions for the assumed effects of substance abuse disorders." Brueggemann, 348 F.3d at 694. Then, and only then, may the ALJ separately determine whether Plaintiff's substance abuse constitutes a contributing factor material to that determination. See also Hundley, 2016 WL 423548, at *5, *7 (similarly concluding that remand was required so that substance abuse could be properly evaluated using the process set out in SSR 13-2p).[5]

Further, in addition to failing to follow the required two-step process for evaluating the impact of Plaintiff's substance abuse, Plaintiff also contends that the ALJ improperly

---

[5] The Court notes that in determining materiality in the context of other mental disorders, SSR 13-2p provides additional guidance:

> 7. *What do we do if the claimant's co-occurring mental disorder(s) improve in the absence of DAA?*
> a. Many people with DAA have co-occurring mental disorders; that is, a mental disorder(s) diagnosed by an acceptable medical source in addition to their DAA. We do not know of any research data that we can use to predict reliably that any given claimant's co-occurring mental disorder would improve, or the extent to which it would improve, if the claimant were to stop using drugs or alcohol.
> b. To support a finding that DAA is material, we must have evidence in the case record that establishes that a claimant with a co-occurring mental disorder(s) would not be disabled in the absence of DAA. Unlike cases involving physical impairments, we do not permit adjudicators to rely exclusively on medical expertise and the nature of a claimant's mental disorder.
> c. We may purchase a CE in a case involving a co-occurring mental disorder(s). We will purchase CEs primarily to help establish whether a claimant who has no treating source records has a mental disorder(s) in addition to DAA. See Question 8. We will provide a copy of this evidence, or a summary, to the CE provider.
> d. We will find that DAA is not material to the determination of disability and allow the claim if the record is fully developed and the evidence does not establish that the claimant's co-occurring mental disorder(s) would improve to the point of nondisability in the absence of DAA.

required objective evidence in evaluating Plaintiff's mental health limitations and "cherry-picked" the evidence by disregarding evidence of Plaintiff's mental health limitations. As discussed above, in Arakas, the Fourth Circuit set out the process for evaluating the impact of a plaintiff's symptoms, and further explained that some conditions simply do not manifest themselves in objective signs and symptoms. Arakas, 983 F.3d at 97. In Shelley C. v. Comm'r of Soc. Sec. Admin., 61 F.4th 341, 361-62 (4th Cir. 2023), the court extended the reasoning in Arakas to include psychological impairments and depression in particular. Because the symptoms of depression are "'entirely subjective,'" the ALJs in these cases erred by "requiring that [the claimants'] subjective statements be validated by objective medical support." Shelley C., 61 F4th at 361-62 (quoting Arakas, 983 F.3d at 96). In the present case, the ALJ repeatedly cited to unremarkable or normal mental status examinations, and the ALJ rejected the Consultative Examiner's psychological report and assessment because it "rel[ied] heavily" on Plaintiff's own subjective reports. (Tr. at 32, 29, 23, 30, 31.) However, it is not clear how the mental status examinations undermined Plaintiff's subjective reports. See Shelley C., 61 F.4th at 361-62 ("Stated differently, symptoms of [depression], like those of fibromyalgia, are 'entirely subjective,' determined on a case-by-case basis. Ultimately, because of the unique and subjective nature of [depression], subjective statements from claimants should be treated as evidence substantiating the claimant's impairment." (internal citations and quotations omitted)). In addition, it is unclear how the ALJ's analysis of these records took into account Plaintiff's multiple week-long involuntary psychiatric admissions during the relevant two-year period and the related evidence of her significant mental health challenges. See Shelley C., 61 F.4th at 362 ("We must also assess the ALJ's decision to disregard Shelley C.'s subjective

statements concerning the intensity, persistence, and limiting effects of her symptoms finding they, allegedly, were inconsistent with the medical evidence in the record" where "the ALJ cherry-picked from the record, highlighting Shelley C.'s good moments and bypassing the bad," since "[t]his violated an ALJ's 'obligation to consider all relevant medical evidence,' which prohibits him from 'simply cherrypick[ing] facts that support a finding of nondisability while ignoring evidence that points to a disability finding.'" (quoting Lewis v. Berryhill, 858 F.3d 858, 869 (4th Cir. 2017))).

Ultimately, the Court cannot follow the ALJ's reasoning with respect to the impact of Plaintiff's substance use, in light of the ALJ's failure to undertake the required analysis under 20 C.F.R. § 404.1535(b) and SSR 13-2p for determining the materiality of Plaintiff's drug use. Further, the Court cannot follow the ALJ's reasoning regarding Plaintiff's subjective mental health symptoms, in light of the ALJ's apparent disregard of Plaintiff's psychiatric symptoms for lack of "objective medical evidence" in contravention of Arakas and Shelley C., and failure to reconcile all of the contrary evidence in contravention of Shelley C. and Lewis.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, that Defendant's Dispositive Brief [Doc. #9] be DENIED, that Plaintiff's Dispositive Brief [Doc. #8] be GRANTED, and that this action be REMANDED for further consideration in accordance with the directives set out herein.

This, the 31st day of August, 2026.

Joi Elizabeth Peake
United States Magistrate Judge